Whitaker, Judge,
dissenting:
I cannot agree with the court’s valuation of these boats. They were laid up in 1934. After three years plaintiff bought the Morey for $320.00, and the Zebedee Cliff for $870.00. The court awards $6,000.00 for the Morey and $7,500.00 the Cliff. This is nearly twenty times what plaintiff paid for the Morey and about nine times what he paid for the Cliff. It is eight times what the Maritime Commission allowed for the Morey and seven and one-half times what the Maritime Commission allowed for the Cliff. It is eight times what the Commissioner of this court allowed for the Morey and seven and one-half times what the Commissioner of this court allowed for the Cliff.
The vessels had been laid up ever since 1934. Captain King, in command of the Naval Base at Boothbay Harbor, said that when he took command in 1941 he found them tied up at a wharf, where they were in the way. He says he finally persuaded the owners to tow them away out to the old lighthouse depot. Then the Government took over the lighthouse depot and they had to get the owners to remove the schooners again. At that time he says they were hulks.
Not since 1934 had they been painted or calked or maintained in any fashion, except that the water was pumped out of the bilges occasionally.
At low tide they lay on the bottom. A ship that is grounded does not give with the waves and the currents. The waves twist it, get it out of shape, and loosen its fastenings.
The witnesses introduced by the Government were witnesses who had inspected the vessels. Plaintiff’s witnesses testified from theory. The following answer of the witness Howard summarizes defendant’s testimony:
*338 There was no paint. There had been no paint on those hulls for many years. The spars had had no paint or varnish. They would come under the category of a
hulk, a vessel that had been dismantled. There was nothing on board them in the way of sails. The rigs were in bad shape. The topmast had been removed. They looked so bad I wouldn’t say they were worth repairing. They had no commercial value. The only use that could be made of them would be as barges and the cost of converting them into barges would be so much it wouldn’t pay to repair them. Good barges would cost $10,000 or $15,000, and it wouldn’t pay to fix these.
Howard was a Marine surveyor and appraiser, and had been since 1907. He had been a ship broker in Boston for a good many years prior to his employment by the Maritime Commission.
Griffith, another witness, had surveyed “probably one thousand” vessels for the Bureau of Marine Inspection and Navigation, and had inspected hulls for the local authorities in Portland, Maine, and had been master of oceangoing and coastwise vessels. He was a graduate of the Merchant Marine Academy. He made a personal inspection of the vessel. After having testified to her condition he says:
In my opinion, so far as using the vessel as a merchant vessel, it would take extensive repairs at an almost prohibitive cost to make the vessel fit for a carrier of cargo, or bulk cargo, due to the excessive admittance of water into the holds. In other words, any cargo in bulk could be destroyed before extensive repairs were made to the hull.
*)• V $ ^ »1:
As I said, I know of no value or purpose that this vessel could have been used for without prohibitive cost of repairs.
In my opinion, the Maritime Commission and the Commissioner of this court have allowed plaintiff all these vessels were worth. He bought them for junk and they were junk, and he should be allowed only junk prices.
Jones, Chief Judge, concurs in this dissenting opinion.